IN THE UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

Appeal No. 21-13791

THE UNITED STATES OF AMERICA,

Plaintiff/Appellee

v.

DANIEL GUTIERREZ,

Defendant/Appellant

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA No. 4:21-CR-11-AW**

# INITIAL BRIEF
## For Appellant Daniel Gutierrez

SHERYL JOYCE LOWENTHAL
Attorney for Daniel Gutierrez
Email: sjlowenthal@appeals.net
Florida Bar No. 163475
221 East Government Street
Pensacola, Florida 32502
850-912-6710

South Florida Office:
9130 S Dadeland Blvd. Suite 1511
Miami, Florida 33156-7851
305-670-3360

CERTIFICATE OF INTERESTED PERSONS

Appellant DANIEL GUTIERREZ, through counsel, and pursuant to Federal Rules of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, submits the following list of all persons and entities who have, or may have an interest in the outcome of this appeal - Judicial Officers, Attorneys, and Parties:

| | |
|---|---|
| Davies, Robert G. | Assistant United States Attorney |
| Debelder, Joseph Frans | Assistant Federal Public Defender |
| Fields, Lazaro | Assistant United States Attorney |
| Fitzpatrick, Hon Martin A. | United States Magistrate Judge |
| Gutierrez, Daniel | Defendant/Appellant |
| Lowenthal, Sheryl Joyce | Appellate Counsel for Mr. Gutierrez |
| Murrell, Randolph P. | Federal Public Defender |
| Weiss, Kaitlin R. | Assistant United States Attorney |
| Winsor, Hon. Allen C. | United States District Judge |

Respectfully submitted,

*/s/ Sheryl Joyce Lowenthal*

Sheryl J. Lowenthal, Atty at Law
Counsel on Appeal for Mr. Gutierrez

C1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

In this case where Appellant (1) was subjected to a traffic stop for a mere infraction warranting only a written warning, and yet was unreasonably delayed until a drug-sniffing dog could arrive at the scene of the stop, and (2) the government was permitted over defense objection to present a pharmacologist "expert" on methamphetamine and fentanyl, whose testimony was irrelevant and incorrect, confusing, inconsistent with other research, methodologies, studies, and papers, Appellant submits that the Court should schedule an oral argument which will allow the Court to inquire of counsel for the respective parties, about those matters that are of greatest interest or concern to the members of panel.

TABLE OF CONTENTS AND CITATIONS

CERTIFICATE OF INTERESTED PERSONS                                C1 of 1

STATEMENT REGARDING ORAL ARGUMENT                                    i

TABLE OF CONTENTS                                                   ii

TABLE OF CITATIONS                                                 iii

STATEMENT OF SUBJECT MATTER
   & APPELLATE JURISDICTION                                         1

STATEMENT OF THE ISSUES PRESENTED                                    2

STATEMENT OF THE CASE

   Course of Proceedings and Disposition in the District Court       3

   The Relevant Facts                                               5

   The Standards of Review                                          13

SUMMARY OF THE ARGUMENT                                             14

ARGUMENT & AUTHORITIES

Issue One

The court erred and abused its discretion in denying the motion to suppress where the traffic stop of Gutierrez' truck for an obstructed license tag and outward- facing tag-light, resulted only in a written warning, but culminated in a delay sufficiently lengthy for a drug-sniffing K-9 unit to be called to the scene to do a "free air sniff" of the truck cab and the cars it was hauling.    16

Issue Two

The court erred and abused its discretion in denying Gutierrez' motions *in limine*, following a *Daubert* hearing,  and allowing the government to present the testimony of proposed DEA pharmacology expert Dr. Jordan Trecki, because his "expert opinions" not only were confusing for the jury, but also were inconsistent with other findings and studies regarding the quantity and quality of methamphetamine for personal use, confusing the jury about the theory of defense that the substances were for personal use and were not possessed with intent to distribute.                                                    28


CONCLUSION                                                                                          32

COMPLIANCE WITH TYPE STYLE & WORD COUNT                              33

CERTIFICATE OF SERVICE & ECF FILING                                        33

TABLE OF AUTHORITIES

Cases:

*Arizona v. Johnson*, 555 U.S. 323 (2009)                                              25

*Brown v. Illinois*, 422 U.S. 590 (1975)                                                 27

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993)        4, 28, 29, 30

*Delaware v. Prouse*, 440 U.S. 648 (1979)                                            21

*Heier v. North Carolina*, 574  U.S. 54 (2014)                                       16

*Michigan v. Chesternut*, 486 U.S. 567 (1988)                                      20

*Miranda v. Arizona*, 384 U.S. 436 (1966)                                        20

*Navarette v. California*, 572 U.S. 393 (2014)                                    16

*Riley v. California*, 373 U.S. 373 (2014)                                        16

*Rodriguez v. United States*, 575 U.S. 348 (2015)            2, 22, 24, 25, 26

*Segura v. United States*, 568 U.S. 796 (1984)                                    27

*Terry v. Ohio*, 392 U.S. 1 (1968)                                            20, 23

*United States v. Arvizu*, 534 U.S. 266 (2002)                                    21

*United States v. Mendenhall*, 465 U.S. 541 (1980)                                20

*Whren v. United States*, 116 S.Ct. 1769 (1996)                              25, 26

*Wong Sun v. United States*, 371 U.S. 475 (1963)                          25, 26, 27


*Allison v. McGhan Medical*, 184 F.3d 1300 (11th Cir. 1999)                       30

*United States v. Boros*, 668 F.3d 901 (7th Cir. 2012)                            32

*United States v. Braddy*, 11 F.4th 1298 (11th Cir. 2021)                     16, 17

*United States v. Chanthasouxat*, 342 F.3d 1271 (11th Cir. 2003)                  21

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004)                29, 31, 32

*United States v. Frazier*, 10th Cir. No. 20-4131, April 13, 2022 (D. Ut)         17

*United States v. Galecki*, 932 F.3d 176 (4th Cir. 2019)                          30

iv

*United States  v. Hansen*, 262 F.3d 1217 (11ᵗʰ Cir. 2001)                    29

*United States v. Holt*, 777 F.3d 1234 (11ᵗʰ Cir. 2015)                    17

*United States v. Hurtt*, 3ʳᵈ Cir. No. 20-2494, April 13, 2022 (EDPa)                    17

*United States v. Jordan*, 635 F.3d 1181 (11ᵗʰ Cirt. 2011)                    13

*United States v. Nahlmani*, 696 Fed.Appx. 457 (11ᵗʰ Cir. 2017)                    30

*United States v. Puglisi*, 723 F.3d 779 (11ᵗʰ Cir. 1984)                    20

*United Sates v. Smith,* 459 F.3d 1276 (11ᵗʰ Cir. 2006)                    13


*English v. State*, 191 So.3d 448 (Fla. 2016)                    21


Other Authorities

United States Constitution

      Fourth Amendment                    18, 20, 22

The United States Code

      Title 18, Section 924(e)(2)(A)(i)                    3

      Title 18, Section 3231                    1

      Title 21 Section 802(32)                    30

      Title 21, Section 841(a)(1)                    3

      Title 21, Section 841(b)(1)(viii)                    3

Title 21, Section 841(b)(1)(C) .......................................... 3

Title 21, Section 853(a)(1)(2) .......................................... 3

Title 28, Section 1291 .................................................. 1

Federal Rules of Evidence

Rule 401 ............................................................... 27

Rule 403 ............................................................. 27, 32

Rule 702 ............................................................. 27, 29

Rule 703

Florida Statutes

Section 316.605(1) ..................................................... 21

STATEMENT OF SUBJECT MATTER
& APPELLATE JURISDICTION

This is an appeal from a final judgment and sentence following a jury trial in the Northern District of Florida in Tallahassee, on one count of possession with intent to distribute 5 grams or more of Methamphetamine and a mixture and substance containing Fentanyl (DE-72). Judgment was entered on October 22, 2021. A notice of appeal was timely filed. Appellate counsel was appointed (DE-76) and these proceedings ensue. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. Section 1291. The Northern District of Florida had jurisdiction pursuant to 18 U.S.C. Section 3231.

According to the United States Bureau of Prisons Website, Daniel Gutierrez is presently incarcerated at FCI Medium in Victorville, California with a presumptive release date in 2029.

1

## STATEMENT OF THE ISSUES PRESENTED

Issue One:  The court erred and abused its discretion in denying the motion to suppress where the traffic stop of Gutierrez' truck for an obstructed license tag and outward-facing tag-light, required only a written warning, but culminated in a delay sufficiently lengthy for a drug-sniffing K-9 unit to be called to the scene to do a "free air sniff" of the truck cab and the cars it was hauling, in violation of the Fourth Amendment, and the Supreme Court ruling in *Rodriguez, infra*.

Issue Two:  The court erred and abused its discretion in denying Gutierrez' motions *in limine*, and after *Daubert* hearing, allowing the government to present the testimony of proposed DEA pharmacology expert Dr. Jordan Trecki, because his "expert opinions" not only were confusing for the jury, but also were inconsistent with other reputable and reliable findings and studies regarding the quantity and quality of methamphetamine for personal use, confusing the jury about the theory of defense that the substances were for personal use and were not possessed with intent to distribute.

2

## STATEMENT OF THE CASE

### *Course of Proceedings and Disposition in the District Court*

The record reflects that in March 2021, an indictment was returned in the Northern District of Florida charging Daniel Gutierrez with possession with intent to distribute a controlled substance involving 5 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, and a mixture and substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. Sections 841(a)(1), 841(b)(1)(B)(viii), and 841(b)(1)(C) (DE-1: 1).

The indictment alleges that in June 2010, Gutierrez was convicted in the Central District of California of a serious drug felony, conspiracy to possess with intent to distribute cocaine and to import cocaine, an offense described in 18 U.S.C. Section 924(e)(2)(A)(i), for which he served a term of imprisonment of more than twelve months and for which he was released from prison on September 29, 2011, within fifteen years of the commencement of the present charged offense (DE-1:2).

There also was a forfeiture allegation pursuant to Title 21, U.S.C. Sections 853(a)(1) and (2), from the violation alleged, punishable by imprisonment for more than one year, that Gutierrez forfeit all interest in property derived from the proceeds of such violation and property used to commit or facilitate the violation (DE-1:2-3).

3

Gutierrez file a motion to suppress evidence and statements. The government filed a response in opposition (DE-19, 26). Following an evidentiary hearing, the motion was denied (DE-27, 30).

Gutierrez filed a motion pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude the testimony of proposed DEA pharmacology expert Dr. Jordan Trecki (DE-42). The court set an expedited schedule for a government response and for defendant's reply (DE-43). Gutierrez filed another motion *in limine.* The government responded (DE-44, 45). The government submitted a trial brief (DE-48). Gutierrez submitted further documentation in support of the motion *in limine* (DE-51).

Jury trial commenced on July 19, 2021 and continued through the 20th and 21st (DE-54, 57, 59, 61). Gutierrez stipulated to the fact of his prior conviction (DE-58). On July 21, 2021, the jury returned a verdict finding Gutierrez guilty on Count 1 (DE-62, 63). A draft Presentence Investigation Report was prepared. Gutierrez submitted a response. A final PSR was filed (DE-66-68). Sentencing was held on October 18, 2021. Gutierrez was sentenced to 120 months in prison (the minimum mandatory term) and 8 years supervised release (DE-71, 72). A notice of appeal was timely filed (DE-74). Appellate counsel was appointed (DE-76). This appeal ensues.

In this brief, docket entries will be denoted as DE followed by the docket number and if required, the page number(s).  The record contains transcripts of the trial, days one, two, and three at DE-86, 87, 88; the sentencing at DE-89; and the motion to suppress on April 30, 2021, at DE-90.  A transcript of opening statements and preliminary jury instructions is docketed at DE-92.

### *The Relevant Facts*

On September 19, 2020, Trooper Gabriel Llanes of the Florida Highway Patrol was in his patrol car on the grassy center median of I-10 in Madison County, Florida, at around 8:55 in the morning observing eastbound traffic when he noticed a semi-truck hauling cars, that had its license tag obstructed by the tag light with the tag light shining toward the rear (DE-86: 26-28).  The truck was going the speed limit (DE-86: 53).  Trooper Llanes followed and stopped the truck.  The driver was Daniel Gutierrez (DE-86: 28-29).  The trooper said he could see the tag light shining from the rear of the trailer and it did not have a cover (DE-896:56).

Gutierrez asked if he could step out of the truck to observe the tag violation for which he was stopped.   Trooper Llanes had decided to write a warning, not a traffic ticket (DE-86: 29).  Llanes called for backup.  Trooper Young arrived at the scene, and then Trooper Cabe arrived in his K9 unit.  The purpose of  bringing the

K-9 is "[t]o conduct a free air sniff of vehicles, to smell the odor of narcotics in vehicles." (DE-86:30, 40). The K9 was run around the tractor trailer and alerted, which Trooper Llanes said led to a probable cause search of the vehicle. In the cab of the truck, in a toolbox behind the driver's seat, they discovered suspected methamphetamine and oxycodone (DE-86: 31, 42). There were dash camera videos and audio recordings of the entire events (DE-86: 31-32). Gutierrez did not appear to be exhibiting symptoms of methamphetamine use such as sweating, nervous, over-talkative, high pulse, or unsteady (DE-86: 34).

The search continued for about three and a half hours (DE-86:43). The two substances appeared to be methamphetamine and oxycodone, and there was a glass pipe (DE-86: 35-36). It should be noted that defense counsel lodged a standing objection to the admission of the evidence and statements and did not waive his objection to the denial of the suppression motion (DE-86: 37). The white substance was suspected methamphetamine. A plastic package of broken blue pills was packed with a tight knot (DE-86: 56-57). The blue pills were suspected to be Oxycodone but later were tested and were found to be fentanyl.

Mr. Gutierrez was cooperative and compliant. He wife was with him in the truck. They both were put in the back of Trooper Young's vehicle as the search was conducted (DE-86:41). The search was thorough but yielded no cash and no

6

paraphernalia such as drug scales or baggies that would be required for distribution of contraband substances (DE-86: 44-46, 69). No fingerprints or DNA swabs were taken (DE-86: 47-48).

Having a blocked or obstructed license plate is a non-criminal traffic violation, not a crime (DE-86: 49). Gutierrez had a valid Arizona driver's license (DE-86: 50). The California registration on the truck was up to date and it had a valid license plate, and the trailer had a valid, up-to-date Maine tag (DE-886: 50).

Trooper Young said Gutierrez seemed to be "a little nervous." (DE-86: 61-62). People under the influence of narcotics usually make exaggerated movements, have rapid breathing and accelerated heart rate, pupils may be dilated or constricted. Gutierrez did not seem to be under the influence of narcotics. Gutierrez was with his wife. When the K-9 sniffed around the tractor trailer, the dog's actions purportedly provided probable cause to search the truck (DE-8: 62-63). Gutierrez and his wife were placed in the back of Trooper Young's vehicle during the search, and were recorded on video and audio (DE-86: 66).

DEA chemist Doroshenko testified that he conducted tests of the substances found in Gutierrez' truck, and that the blue tablet fragments that seemed to be Oxycodone actually were fentanyl, a synthetic opioid and acetaminophen an OTC pain reliever. The tablets were the color and had markings of oxycodone, but they

7

were not (DE-86: 78-79).  He did not test for purity (DE-86: 83).  Another DEA chemist, Erin Schaeffer, tested the other substance and determined that it was 98 percent pure methamphetamine and a cutting agent (DE-86: 91-92).

After the chemist's testimony on day one of trial, the *Daubert* hearing was conducted, based on defense counsel's motions *in limine* to exclude the testimony of DEA pharmacology expert Dr. Jordan Trecki (DE-86: 108-176).  Dr. Trecki testified about his background, education, and qualifications (DE-86: 108-112) and to his opinions about what quantities of methamphetamine would be fatal for a normal person, and quantities that would be fatal for someone who had used methamphetamine for a long time and who had acclimated or developed tolerance to it, and who needed larger and larger quantities to get the desired "high" from it (DE-86: 131-132).

On cross defense counsel asked if more than 150 milligrams of methamphetamine would likely be lethal, what about other research and other studies that showed that heavy users  could use greater quantities and not die from it (DE-86: 146-153).   Counsel asked Dr. Trecki about the report of the National Highway Traffic Safety Administration information related to methamphetamine. He was not familiar with that (DE-86:153).

8

Counsel also asked about the Drug and Alcohol Dependency Journal and also General Psychiatry, which journals were peer-reviewed and concluded that their conclusions were that far greater quantities could be tolerated and not be fatal (DE-86: 155-160).

At the beginning of day two of trial, the court heard counsels' arguments on the motion to exclude Dr. Trecki. Defense counsel said the key issue was whether Gutierrez possessed contraband **with intent to distribute** or whether it was for personal use, and that "there is nothing that Dr. Trecki adds that would go towards that, but … the broken pills aspect of it, … what he testified to … was not based on reliable methods for Dr. Trecki to testify." Dr. Trecki's testimony was not relevant to whether the defendant possessed with intent to distribute (DE-87: 1-20).

The court denied the motion to exclude and found Dr. Trecki competent to testify. His credentials were impeccable. As to methamphetamine, his methodology was consistent with the literature and his conclusions (DE-87: 20-21). The court found that Dr. Trecki could be helpful for the jury to understand methamphetamine dosages. Fentanyl, however, was more difficult because there was no purity level, so it was a closer call, but it was a very potent substance (DE-87: 23-24) . The judge did exclude some of Dr. Trecki's slides (DE-87: 24-28).

9

Next, official court interpreter Tania Sadler was called to testify to her translations of discussions that Gutierrez and his wife had while sitting in Trooper Young's vehicle for more than two hours during the search of the truck (DE-87: 35-64). They spoke in English, but some of the conversation was in Spanish and some of it was unintelligible. Further, it totally without context.

Dr. Trecki then testified as a government expert (DE-87: 75 to 147). Defense counsel's cross examination demonstrated that other agencies and organizations reached much different estimates as to quantity of substance that would be fatal to a normal human being. After Trecki's testimony the defense moved for a mistrial on grounds that his testimony had changed substantially as to the maximum amount that a user could consume a day such that it was different than what he said the day before in the *Daubert* hearing. It affected the reliability consideration the court made in allowing him to testify. The testimony before the jury completely changed the amounts the witness said the day before that would be the highest levels a person could tolerate without dying (DE-87: 149, 150).

The motion for mistrial was denied. The court found that Dr. Trecki did say although unlikely, but "in an extreme case," a person could consume a higher dose and survive. The court denied a mistrial, finding no prejudice (DE-87: 152).

10

The government rested its case.  Daniel Gutierrez testified in his defense (DE-187: 168-212).   He said that he knew the drugs were in the cab of the truck, and he was a "user."  He did not intend to distribute the drugs (DE-87: 169).  Gutierrez said he uses methamphetamine and has done so for about 18 years since was 19 or 20 years old.   He stopped during his first incarceration.  In September 2020, he was using again (DE-87: 170).  He was released from prison in 2011 and violated supervised release due to urine tests that revealed methamphetamine use.  He used it daily, he said (DE-87: 171-2).   He was in rehab for methamphetamine abuse and was thrown out of a halfway house because of continued "dirty urine" tests" (DE-87: 172-73).

He took a commercial driver's license (CDL) program (DE-87: 173) and stayed sober.  He got a job with Global Transport in California.  His friend Adam Sanchez, who worked there got him the job.   They drove together as a team at first for several trips, and then Gutierrez drove across the country on his own.  The truck belonged to Global Transport (DE-187: 174).

Gutierrez said that when he used methamphetamine he would  put it in a pipe, burn it down, smoke, put it away.  He would take four or five hits at a time.  Then after an hour or two he would take another four or five hits throughout the day.  The

11

methamphetamine was in the form of crystal shards. (DE-87-175). He did not use meth when he drove with his friend, but he did when he drove on his own. He drove trailers loaded with cars from California to Florida and then brought cars back from Florida to California, earning $4,500 to $5,000 every two weeks (DE-87: 176-79).

He said that he got his drugs from a dealer named Christian (nickname "Pelon"). He paid about $200 and received an ounce and a half of meth. The dealer also gave him the plastic bag full of broken blue pills (DE-87 181-83). Gutierrez took the bag of pills but never touched them (DE-9 182-83).

He and his wife had been married for about one month when the truck was stopped and Gutierrez was arrested in Florida (DE-87: 183). She knew he had past problems with drugs. On the trip he used meth, but not in front of his wife. He kept the toolbox n which the drugs were found, on his side of the cab (DE-87:186). When she was asleep he would go into one of the cars on the trailer and smoke in there. He used meth about three times each day (DE-87: 187). He used, not to get high, but just to be able to function normally, to feel normal (DE-87: 188).

He did not want anyone to know that he was a drug user – especially his wife. He possessed the quantity that was found because he planned to use and smoke them. He did not know where he could obtain drugs in Florida, so he needed enough to get

12

through more than a month of traveling. That quantity was to be used over more than a month (DE-87: 198).

The defense called another witness, Adam Sanchez, who said that he and Gutierrez knew each other since their childhood in Arizona. Sanchez helped Gutierrez get his job hauling cars for Global Transort (DE-87: 212). Sanchez worked there since 2018, hauling cars across the country. Global Transport was a Christian company run by a pastor, and he liked that.

### *The Standards of Review*

The denial of a motion to suppress involves mixed questions of law and fact. *See, United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006). This Court reviews the district court's findings of fact for clear error and its application of the law to the facts *de novo*. *Ibid.* This court construes factual findings in the light most favorable to the prevailing party, *Smith, supra*, but this Court is "…not restricted to the evidence presented at the suppression hearing and instead [will] consider the whole record." *United States v. Jordan*. 635 F.3d 1181, 1185 (11th Cir. 2011).

This Court will review a decision regarding admissibility and reliability of expert testimony for an abuse of discretion. *United Stats v. Holt*, 777 F.3d 1234, 1264 (11th Cir. 2015).

13

## SUMMARY OF THE ARGUMENT

Daniel Gutierrez' conviction and sentence should be vacated and reversed, and the cause remanded for further proceedings for either - or both - of the reasons presented in this brief in the issues on appeal.

First, the motion to suppress should have been granted because evidence seized from inside the cab of the truck that Gutierrez was driving, specifically methamphetamine and a tightly tied up plastic bag of crushed  blue pills that appeared to be oxycodone, but after testing were determined to be fentanyl;  as well as Gutierrez' subsequent statements including an admission that the substances seized from a toolbox behind the driver's seat of the truck, all were inadmissible and were seized in violation of the Fourth Amendment as a result of the unreasonably prolonged traffic stop for a non-criminal traffic violation that resulted in a written warning, not even a traffic ticket.

In addition to the denial of the motion to suppress evidence and statements, the second issue arose from the court's denial of a motion *in limine* to exclude the testimony of proposed government expert DEA pharmacologist Dr. Jordan Trecki. His testimony did not address the key issue in the case, which was whether or not Gutierrez possessed the two substances found in the toolbox with  intent  to distribute,  or  whether, as he testified at trial, he possessed them for personal

14

use.  Was there a quantity that might be construed to be for purposes of distribution? Possibly.  However, when a physician prescribes medications for, say, high cholesterol, or for high blood pressure, or for blood glucose control, and the prescription is filled at Walgreens, or CVS, or a neighborhood pharmacy, it is likely to be a 90-day supply.  Are we taking all of those pills immediately?  Of course not, they are intended to last for three months.  But there may be a financial benefit to purchase 90 doses at once, and then we benefit from the convenience of not having to return to the pharmacy every 30 days to refill our prescriptions.  Same with Gutierrez and his testimony about his use of methamphetamine.  He testified that he was driving a Global Transport Group truck, hauling a trailer filled with cars for Global Transport, back and forth across the country from California to Florida a few times a month, on the road for weeks at a time.  He wanted to have a supply with him that would last for a month or a little longer.  He needed his methamphetamine, he said, to feel normal.  He apparently was so acclimated to it, that he needed more to get the "high" it provided, and he just needed some to keep him feeling "normal." Addiction is not a good thing, but it explains why this quantity was in his possession for personal use, not for distribution.  There were no indicia of distribution such as drug scales or baggies.   There was only one pipe that he used to smoke his meth.

15

## ARGUMENT & AUTHORITIES

### Issue One

The court erred and abused its discretion in denying the motion to suppress where the traffic stop of Gutierrez' truck for an obstructed license tag and outward- facing tag-light, resulted only in a written warning, but culminated in a delay sufficiently lengthy for a drug-sniffing K-9 unit to be called to the scene to do a "free air sniff" of the truck cab and the cars it was hauling.

The Fourth Amendment of the United States Constitution protects individuals from unreasonable searches and seizures. A traffic stop for a suspected violation of law is considered a seizure of the vehicle's occupant and must be conducted pursuant to the Fourth Amendment. *See, United States v. Braddy,* 11 F.4th 1298, 1307 (11th Cir. 2021)*, citing Heien v. North Carolina*, 574 U.S. 54, 60, 135 S.Ct. 530 (2014). To justify this type of seizure, however, officers need only have "reasonable suspicion," meaning a particularized and objective basis for suspecting the particular person stopped of breaking the law. *Id., quoting Navarette v. California* 572 U.S. 393, 396, 134 S.Ct. 1683 (2014). The "ultimate touchstone of the Fourth Amendment is 'reasonableness.' " *Riley v. California*. 373 U.S. 381, 134 S.Ct. 2473 (2014).

16

This Court will review the district court's decision on admissibility and reliability of expert testimony for an abuse of discretion. *United States v. Holt*, 777 F.3d 1234, 1264 (11th Cir. 2015).

In *United States v. Braddy*, 11 F.4th 1298 (11th Cir. 2021), this Court affirmed the denial of a traffic stop where one of the issues on appeal was whether the officers unlawfully delayed the traffic stop in order to wait for drug-sniffing dogs to arrive, even if there was reasonable suspicion for the initial stop, and lack of probable cause to search the vehicle.

However in two very recent decisions issued on April 13, 2022, the Third Circuit and the Tenth Circuit each reversed a district court's denial of a motion to suppress evidence obtained during a roadside search of a vehicle. *See, United States v. Antoine Dwayne Frazier*, Case No. 20-4131, Tenth Circuit, on appeal from the District of Utah, April 13, 2022; and *United States v. James Hurtt*, Third Circuit Case No. 20-2494, on appeal from the Eastern District of Pennsylvania, April 13, 2022. The Third Circuit's decision in *Hurtt* may be somewhat distinguishable on its facts; but the Tenth Circuit's decision in *Frazier* is undeniably similar to the facts of record in the present case.

17

The district erred in denying Gutierrez' motion to suppress evidence and statements because the discovery and seizure of the drugs and the pipe, and the statements provided by the defendant were the product of an unlawful, unreasonable, warrantless seizure and search in violation of Fourth Amendment guarantees.

It was elicited at the hearing on the motion to suppress, DE-90, that on September 19, 2020, Gutierrez was driving a Freightliner Cascadia truck with an attached trailer on I-10 eastbound in Madison County, Florida. The trailer was carrying cars and was full except for one space.  Gutierrez worked for Global Transport Group and had driven across the country, headed to South Florida to deliver cars for Global Transport.  The trailer was owned by Global Transport Group. FHP Trooper Gabriel Llanes parked his patrol car in the center median between the eastbound and westbound I-10 in Madison County, Florida that morning near Mile Marker 255.  Gutierrez drove past Trooper Llanes.  The trooper pulled out and began to overtake Gutierrez.  Trooper Llanes pulled up next to the truck cab, looked inside and then fell in behind Gutierrez.   The trooper turned on his lights and initiated a stop of Gutierrez's truck.  Gutierrez complied and pulled the truck and trailer over to the side of  I-10.

18

Trooper Llanes walked to the driver's side of the cab and told Gutierrez that he pulled him over because the tag lights on the trailer were obstructing the view of the trailer's license plate. Troper Llanes asked Gutierez for his driver's license and paperwork for the truck. Gutierrez provided his license and all requested paperwork for the truck. Gutierrez and Trooper Llanes walked to the back of the trailer and Trooper Llanes explained the reason for the stop. The tag lights were obstructing the trailer's license plate.

The trooper then went to his patrol car to run Gutierrez's information and the license plates on the truck and the trailer. At 9:01 a.m. Trooper Llanes completed a written traffic warning for "obstructed tag/white light facing towards rear." While he was in his patrol car, Florida Highway Patrol Trooper Young arrived and started speaking with Gutierrez. Trooper Young then contacted Florida Highway Patrol Officer Cabe, and asked him to come to the scene with his K-9 for a "free air sniff" of the truck and trailer.

At approximately 9:12 a.m. Trooper Cabe arrived with his drug sniffing K-9 dog. The dog conducted a canine external search of the truck and trailer. Trooper Cabe advised that the dog alerted on the truck cab and one of the cars on the trailer. A search was conducted of the truck cab, trailer, and the cars on the trailer. Inside

19

the truck cab, a bag was located containing some 30 grams of methamphetamine, what appeared to oxycodone, and a glass pipe. Following *Miranda* warnings Gutierrez made statements that the drugs were his.

Defense counsel argued that this stop lacked reasonable suspicion or probable cause of any traffic violation or criminal activity. The Fourth Amendment proscribes all unreasonable searches and seizures. This Court has held that there are three levels of police-citizen encounters: (1) those in which the police officer seeks to communicate with a citizen without coercion or detention proscribed by the Fourth Amendment, (2) seizures that must be founded on reasonable suspicion, and (3) full-scale arrests that require probable cause. *United States v. Puglisi*, 723 F.3d 779, 783 (11th Cir. 1984). The police can be said to have seized an individual if, in view of all the surrounding circumstances, a reasonable person would believe that he was not free to ignore the police presence and to leave. *Michigan v. Chestnut*, 486 U.S. 573 (1988), citing *United States v. Mendenhall*, 465 U.S. 544, 554 (1980). If a police encounter escalates into a seizure , the police must have individualized reasonable articulable suspicion that the person was, is, or is about to be, involved in criminal activity based on specific and articulable facts. *See, Terry v. Ohio*, 392 U.S. 1, 27 (1968). The same requirement of founded reasonable suspicion for a stop

applies to stops of individual vehicles. *United Sates v. Arvizu*, 534 U.S. 266 (2002); *United States v. Cortez*, 449 U.S. 411  (1981); *Delawarre v. Prouse*, 440 U.S. 648 (1979).

A traffic stop is a constitutional detention if it is justified by reasonable suspicion or probable cause to believe a traffic violation has occurred.  *United States v. Chanthasouxat,* 342 F.3d 1271, 1275 (11th Cir. 2003).

Florida Statutes Section 316.605(1), requires that license plates be clear and distinct and free from defacement, mutilation, grease, and other obscuring matter, so they will be plainly visible and legible at all times, 100 feet from the rear or front. The Florida Supreme court held in *English v. State*, 191 So.3d 448, 451 (Fla. 2016), that Section 316.605(1) does not distinguish between obscuring matter that is on, or external to the license plate.   A tag light, hanging down in front a license plate, obscuring its alphanumeric designation is a violation of the law.

In contrast to the *English* case,  the question here is not whether the tag lights could be obscuring the plate, but whether the lights were in fact obscuring the plate's alphanumeric designation.

The Fourth Amendment guarantees a person's right to be free from unreasonable searches and seizures.  Because a traffic stop is a seizure for consti-

21

tutional purposes, it is subject to the Fourth Amendment reasonableness standard. To be reasonable a traffic stop must be justified at its inception and the officer's actions must be reasonably related in scope to the mission of the stop.

In *Rodriguez v. United States*, 575 U.S 348 (2015), the Supreme Court explained that an officer's authority to seize the occupants of a vehicle ends when tasks tied to the traffic infraction are, or reasonably should have been completed. *Id*. at 354. Reasonableness in this context is defined by what the officer actually does. *Ibid*. If an officer can complete the traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete the stop's mission. An officer may conduct certain unrelated inquiries during the stop, but he may not do so in a way that prolongs it absent the reasonable suspicion ordinarily required to detain an individual. *Id*. at 355.

In *Rodriguez*, a K-9 officer stopped Rodriguez for driving on the shoulder of a highway in violation of Nebraska law. The officer did everything related to the stop including checking the driver's license for the driver and the passenger and issuing a warning. He asked permission to walk his dog around the vehicle. Rodriguez refused. The officer detained him until another officer arrived and that officer's dog alerted to the presence of drugs. The search that followed revealed

22

methamphetamine.  Seven or eight minutes elapsed from the time the warning was issued until the dog alerted.  Rodriguez was indicted.  He moved to suppress the methamphetamine because the officer prolonged the stop without reasonable suspicion.    The district court denied the motion.  The Eighth Circuit affirmed, referring to the delay as  a *de minimus* intrusion on personal liberty.  The Supreme Court vacated the conviction finding that absent reasonable suspicion, extension of a traffic stop to conduct a dog sniff constitutes an unreasonable search; likening a routine traffic stop to a brief "Terry" stop.  Its tolerable duration is determined by the "mission."    Authority for the search and seizure ends when tasks tied to the traffic infraction are or reasonably should be completed.    Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the traffic mission.    An officer who completes the traffic-related task expeditiously does not earn extra time to pursue unrelated criminal investigations.  **The question is not whether the dog sniff occurs before the ticket is issued, but whether conducting the sniff added time to the stop.**   The district court's decision that detention for the dog sniff was not independently supported by individualized suspicion was not reviewed by the Eighth Circuit.  Rodrigeuz' conviction was vacated and the case was remanded.

Under *Rodriguez*, therefore, an unlawful seizure occurs any time an officer (1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that prolongs or adds time to the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion, *Rodriguez*, 575 U.S. at 357-58.   Even *de minimis* delays caused by related inquiries violate the Fourth Amendment absent reasonable suspicion. *Ibid*.

If the  initial stop was proper, then Trooper Llanes impermissibly prolonged the stop to wait for the drug sniff dog.  Under *Rodriguez*, this court should determine whether his activities diverted from the traffic-based mission of the stop in a way that prolonged it and if so, whether the trooper had sufficient reasonable suspicion to justify the delay.   The reasonableness of a seizure depends on what the police in fact do.  *Rodriguez*, 575 U.S. at 357. Each minute spent after sufficient time to prepare a warning has passed, unnecessarily prolongs the stop.

Although there was a suggestion that because the driver's license was from Arizona, the truck cab was licensed in California, and the trailer was licensed in Maine, took longer than usual to gather all information to confirm the validity of each, the delay to arrange for a dog sniff was impermissible because there was no reasonable suspicion of drug trafficking at that point.

24

Reasonable suspicion requires a particularized and objective basis for suspecting criminal conduct under a totality of the circumstances.    There was no sufficient reasonable suspicion because the trooper lacked reasonable suspicion to extend the stop by several minutes to arrange for a dog sniff.  Gutierrez' seizure violation the Fourth Amendment.

*Rodriguez* holds that when reasonable suspicion is lacking at the "Rodriguez moment" seizure of the individual remains illegal from that point forward. *Rodriguez,* 575 U.S. at 355.  The seizure remains lawful only so long as unrelated inquiries do not measurably extend the duration of the stop. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)   Evidence discovered because of the seizure was tainted by unlawfulness and is inadmissible. *Wong Sun v. United States,* 371 U.S. 471, 484-86 (1963).

This Court should reverse the district court's denial of the motion to suppress, and remand for further proceedings.    Even if the stop were constitutional, the extension of the stop[ beyond permissible duration prior to the dog sniff search violated the Constitution's shield against unreasonable seizures.  In *Whren v. United States,* 116 S.Ct. 1769 (1996), the Supreme Court addressed the standard for when a traffic stop  could be conducted, and found that as long as a reasonable officer in

the same circumstances could have stopped a vehicle, then the stop was constitutionally reasonable. Significantly, *Whren* did not address the reasonableness of the duration of the stop. *Whren,* 116 S.Ct.. at 1772 (cocaine was seen in Whren's hands immediately upon approaching the vehicle at the time of the stop).

In addressing the duration of a stop the Supreme Court has found that the tolerable duration of police inquiries in the traffic stop context is determined by the seizure's mission to address the traffic violation that warranted the stop, and attend to related safety concerns. *Rodriguez, supra*. Determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop such as checking the driver's license, determining if there are outstanding warrants against the driver, and inspecting the vehicle registration and proof of insurance.

Even if the stop of Gutierrez was valid, it was unreasonably delayed to conduct the dog sniff search. The reasonableness of a seizure depends on what the police in fact do. The written warning was completed at 9:01 a.m. Trooper Llanes had described the violation to Gutierrez prior to entering his car and completing the written warning. The purpose of the stop should have been completed with a written warning, but the K-9 unit did not arrive and the dog sniff search did not begin

26

until more than ten minutes later. The stop was prolonged to wait for the arrival of the K-9 unit to conduct the dog sniff search.  That dog sniff was unconstitutional. The length of time the stop was s prolonged does not matter.  It was indisputably prolonged beyond what was necessary for the mission of this stop.

Gutierrez was unreasonably seized without reasonable suspicion in violation of the reasonable suspicion in violation of the Fourth Amendment when the dog sniff search occurred.  Evidence and statements obtained as a result of the stop must be suppressed as fruit of the poisonous tree. *Wong Sun*, 371 U.S. at 484-85.  Statements obtained as the result of an illegal arrest or seizure are presumptively coerced and tainted by the illegality and the fruit of the poisonous tree doctrine. *Segura v. United States*, 468 U.S. 796, 804 (1984); *Brown v. Ilinois*, 422 U.S. 590, 604 (1975).   For all of the above reasons, the motion to suppress should have been granted, the conviction should be vacated and the case remanded for further proceedings.

Issue Two

The court erred and abused its discretion in denying Gutierrez' motions *in limine*, after a *Daubert* hearing,  allowing the government to present the testimony of proposed DEA pharmacology expert Dr. Jordan Trecki because his "expert opinions" not only were confusing for the jury, but also were inconsistent with other findings and studies regarding the quantity and quality of methamphetamine for personal use, confusing the jury about the theory of defense that the substances were for personal use and were not possessed with intent to distribute.

The court erred in denying the motion *in limine* to exclude the testimony of

Dr. Jordan Trecki pursuant to Federal Rules of Evidence 401, 403, 702, and 703.

His testimony was irrelevant to the issues at trial and should have been excluded.

His opinions and conclusions as to dosage were unreliable.  The court erred in

allowing Dr. Trecki to testify after the hearing pursuant to *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), discussing whether the methodology

employed by Dr. Trecki, and how he applied that methodology in reaching his

conclusions were sufficiently reliable. To the extent there may have been any

relevance of his testimony as to the side effects, potency, comparisons, and

documentation of the use of the drugs here it was greatly outweighed by the

inflammatory and prejudicial effects.  As a DEA pharmacologist the witness testified

about dosages, side effects, profiles and consequences of over or under-use of drugs.

In *Daubert* the Supreme Court instructed that trial courts are to perform as strict gatekeepers to ensure that an expert's testimony both rests on reliable foundation and is relevant to the issues. *Daubert*, 509 U.S. 579, 597. This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). As require by Rule 702 expert testimony must be reliable and relevant.

This Court has a three-part test to determine the admissibility of expert testimony: whether the expert is qualified to testify competently regarding the matters s/he intends to address, whether the methodology employed by the expert is sufficiently reliable, and whether the testimony assists the trier of fact, through the application of scientific technical or specialized expertise to understand the evidence or to determine a fact in issue. *United States v. Hansen*, 262 F.3d 1217, 1233 (11th Cir. 2001). The burden to establish qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or defendant in a civil suit, or the government or the accused in a criminal case. *Frazier*, 38 F.3d at 1260. Scientific expert testimony introduces special dangers to

29

the factfinding process because it can be both powerful and be both powerful and quite misleading because of the difficulty in evaluating it. *Daubert*, 509 U.S. at 595.

Dr. Trecki's testimony should have been excluded because it was irrelevant. Relevant testimony logically advances a material aspect of a party's case. *Allison v. McGhan Medical Corp,* 184 F.3d 1300, 1312 (11th Cir. 1999).

In cases involving controlled substance analogues, as defined in 21 U.S.C. Section 802(32), testimony of a pharmacological expert may be relevant. In such cases experts can help the jury understand what similarities exist, if any, in chemical structure and pharmacological effects between the subject drugs and scheduled controlled substances. *United States. Nahlmani*, 696 Fed.Appx. 457 (11th Cir. 2017); *United States v. Reulet*, No. 14-40005-DDC 2015 @L 7776876, at 10 (D.Kan.Dec.2, 2015); and *see United States v. Galecki*, 932 F.3d 176 (4th Cir. 2019) (stating that unlike Drs. Croatt and Dudley, Dr. Berrier could have rebutted the testimony of Dr. Trecki, the government's DEA expert with his own knowledge of DEA processes and analyses. His expert testimony diverged from Dr. Trecki's and could have shown the jury that the DEA's own scientists could not agree on the substantial similarity of the chemicals at issue).

But the present case did not involve a controlled substance analogue.   Here, both methamphetamine and fentanyl, are scheduled controlled  substances.  Consequently,  there  was  no  issue  and  no  challenge  to  whether  either  was  an  illegal controlled substance. ***The issue was whether Gutierrez intended to distribute the methamphetamine and fentanyl,.*** and Dr. Trecki's testimony did not address that. It  focused  on  the  chemical  makeup  and  pharmacological  effects  of  known  and scheduled controlled substances.  His testimony was irrelevant to the issue here and should have been excluded.

Dr. Trecki's opinions as to dosage was not founded on reliable methodology and did not apply methodology to reach a sufficiently reliable conclusion.

If his testimony had any relevance to the issue of intent to distribute, his conclusions as to dosage were unreliable.  *Daubert* requires for reliability, that the methodology has been tested, whether it was subjected to peer review, or publication, the  the known or potential rate of error of the particular scientific technique, and  whether  the  technique  was  generally  accepted  in  the  scientific  community. *Frazier*, 387 F.3d at 1262.  His conclusions were contradictory to accepted reliable expert testimony as to what constitutes a user amount of methamphetamine.

Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet admissibility requirements ma still

31

be excluded under Rule 403. *Frazier,* 387 F.3d at 1263. Dr. Triecki's testimony as to side effects, potency comparison, and consequences of use should have been excluded because it was more prejudicial than probative. *United States v. Boros*, 668 F.3d 901, 910 (7th Cir 2012). For all of the foregoing reasons, Dr. Trecki's testimony sh oujdl have been excluded because it was confusing, did not address the key issue, was not founded on acceptable methodology, and was contradicted by other sources, including respected and accepted studies, organizations, reports, journals, and experts. The conviction should be vacated, the cause revesed and remanded for further proceedings.

CONCLUSION

Wherefore, Appellant prays that this Honorable Court will vacate and reverse the conviction and sentence imposed on Daniel Gutierrez, and will remand to the district court for further proceedings with such instructions as the Court deems appropriate.

Respectfully submitted,

*/s/ Sheryl Joyce Lowenthal*
Sheryl J. Lowenthal, Atty at Law
Counsel on Appeal for Mr. Gutierrez

COMPLIANCE WITH TYPE STYLE & WORD COUNT

This brief is prepared in Times new Roman, 14-Point Font.  According to the Word Program on which it is prepared  the relevant portions of this initial brief contain no more than 6,925 words.

CERTIFICATE OF SERVICE & ECF FILING

I certify that I electronically filed this brief with the Clerk of Court *via* CM/ECF on April 26, 2022, for service on all parties, and all counsel who are registered with ECF in this appeal.

*/s/ Sheryl Joyce Lowenthal*
Sheryl J. Lowenthal, Atty at Law
Counsel on Appeal for Mr. Gutierrez